UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
L.J.B., individually and on behalf of I.J.B., a child
with a disability,

                                                Plaintiff,

        - against -

NORTH ROCKLAND CENTRAL SCHOOL
DISTRICT,

                                                Defendant.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 21-CV-7028 (CS)

<u>Appearances</u>:

Francesca Antorino
Cuddy Law Firm, PLLC
Valhalla, New York
*Counsel for Plaintiff*

Neelanjan Choudhury
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

        Before the Court are the cross-motions for summary judgment of Plaintiff L.J.B.

("Plaintiff" or the "Parent"), acting individually and on behalf of I.J.B., a child with a disability,

(ECF No. 16), and of Defendant North Rockland Central School District ("Defendant" or the

"District"), (ECF No. 18).  Plaintiff brings this case pursuant to the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482,[1] and New York Education Law § 4404.

---

[1] The IDEA was amended in 2004 by the Individuals with Disabilities Education
Improvement Act, but cases discussing the IDEA remain authoritative.

(ECF No. 1 ("Compl.") ¶ 1.)  For the following reasons, Plaintiff's motion is DENIED and

Defendant's motion is GRANTED.

I.  **BACKGROUND**

   A.  **Facts**

   The following facts are based on the parties' Local Civil Rule 56.1 Statements, (ECF No.

17 ("P's 56.1 Stmt."); ECF No. 20 ("D's 56.1 Stmt.")), their responsive 56.1 Statements, (ECF

No. 24 ("P's 56.1 Resp."); ECF No. 21 ("D's 56.1 Resp.")), and the administrative record,[2] and

are undisputed unless otherwise noted.

   During the school years in question – 2017-2018, 2018-2019, and 2019-2020 – Plaintiff

and I.J.B. resided within the County of Rockland and within the District.  (P's 56.1 Stmt. ¶¶ 1, 5-

6.)  I.J.B., who was fourteen years old at the time this action was filed, (D's Ex. 2 at 1), has been

diagnosed with spastic diplegic cerebral palsy and Attention-Deficit/Hyperactivity Disorder, and

therefore has been classified as a student with multiple disabilities under the IDEA, (P's 56.1

Stmt. ¶¶ 10-13).  A 2018 psychological evaluation classified I.J.B.'s overall intelligence as

moderately delayed, (D's Ex. 5 at 2; *see* D's 56.1 Resp. ¶ 13), and a March 2020

neuropsychological evaluation found that he had a mild intellectual disability, (D's Ex. 25 at 16;

*see* P's 56.1 Stmt. ¶ 13).  I.J.B. also has deficits with his speech-language skills, making it

---

   [2] The Office of State Review has provided the Court with the administrative decisions of
the Impartial Hearing Officer ("IHO") and the State Review Officer ("SRO"), along with the
certified record of the impartial hearing, including the pre-hearing transcripts, ("Pre-Hearing
Tr."), hearing transcripts ("Tr."), exhibits, and post-hearing briefs.  The pages of the hearing
transcripts are numbered sequentially.  At the impartial hearing, exhibits offered by the District
were identified by number and exhibits offered by the Parent were identified by letter.  (*See
generally* Tr. at 243-245, 588, 936, 1193, 1384.)  For purposes of this decision, the Plaintiff's
exhibits will be denoted by "P's Ex." and the District's exhibits will be denoted by "D's Ex."

difficult for his verbal communication to be understood by an unfamiliar listener.  (P's 56.1 Stmt. ¶ 14.)

I.J.B. attended school in the East Ramapo Central School District for the 2015-2016 school year and most of the 2016-2017 school year, transferring to the District in around February or March of 2017.  (*See* Tr. at 267:22-268:4; D's Ex. 1 at 1; D's Ex. 2; D's 56.1 Stmt. ¶¶ 2, 4.)[3]  While enrolled at East Ramapo, I.J.B. was placed at the Jesse J. Kaplan School ("Kaplan"), a center-based school run by the Rockland County Board of Cooperative Educational Services ("BOCES").  (Tr. at 267:25-268:19; *see id*. at 306:2-10.)  Upon his transfer, he continued at Kaplan for the remainder of the year.  (D's 56.1 Stmt. ¶ 5.)  For the following three school years at issue in this case, the District was responsible for providing I.J.B. with a Free Appropriate Public Education ("FAPE").  (P's 56.1 Stmt. ¶ 7.)  The District's Committee on Special Education ("CSE") was responsible for working with Plaintiff to develop an Individualized Education Program ("IEP") that set forth I.J.B.'s social, emotional, and educational needs and goals.  *See* 20 U.S.C. § 1414(d); 34 C.F.R. §§ 300.301-.328; N.Y. Educ. Law § 4402; 8 N.Y.C.R.R. §§ 200.3, 200.4(d)(2).  While enrolled at the District during the years in question, I.J.B. continued to attend Kaplan.  (*See generally* D's Exs. 4, 10, 17.)

Since March 2021, I.J.B. has been enrolled at Shrub Oak International School ("Shrub Oak"), a private school at which he was placed by the Parent.  (P's 56.1 Stmt. ¶ 8.)

### 1.    Kaplan

On March 2, 2017, the District's CSE decided to continue I.J.B.'s placement in Kaplan's social communication program for the remainder of the 2016-2017 school year.  (D's Ex. 3 at 1;

---

[3] The record occasionally refers to the District as the Haverstraw-Stony Point Central School District, the District's prior name.  (Tr. at 168:11-19.)

Tr. at 314:17-22; D's 56.1 Stmt. ¶¶ 5-6.)  Kaplan is an out-of-district placement, in that it is

located on a BOCES campus, not at a public school.  (Tr. at 268:14-19.)  I.J.B. has never been

enrolled in a program within his home school district.  (*Id*. at 269:6-8.)

Kaplan offers different specialized programs, including I.J.B.'s social communication

class.  (D's 56.1 Stmt. ¶ 10; *see* Tr. at 306:18-308:4.)  All students enrolled at Kaplan are

"alternately assessed" and are not placed by grade levels, but are placed with students who are

within 36 months of each other.  (D's 56.1 Stmt. ¶ 9; *see* Tr. at 308:7-13.)  Mr. Gianluca

DiMuccio is the principal at Kaplan, and before that, he was a Board Certified Behavior Analyst

("BCBA") in a public school district and worked for two in-home Applied Behavior Analysis

("ABA") therapy organizations.  (D's 56.1 Stmt. ¶ 11; *see* Tr. at 302:14-303:16.)  All of the staff

at Kaplan are either also BCBAs or have received ABA training.  (D's 56.1 Stmt. ¶ 14; Tr. at

312:18-313:12.)  Kaplan implements strategies from the TEACCH model and has adopted a

version of Positive Behavioral Intervention Supports ("PBIS").  (Tr. at 312:3-17, 315:25-316:12,

321:24-322:8.)  Kaplan consists of one floor with some ramps and a pool, which I.J.B. has used.

(*Id*. at 308:24-309:8, 311:20-312:2, 877:12-17.)

I.J.B. was placed in Kaplan's 8:1+2[4] social communication special class, (*id*. at 269:9-16,

381:9-12, 623:11-13), and qualified for extended school year (in other words, twelve-month)

services, (D's 56.1 Stmt. ¶ 3).  According to DiMuccio and other witnesses, I.J.B.'s class focuses

on communication and social skills, as well as academics, and includes a mix of verbal and

nonverbal students, with most of the students using language to communicate, socialize, and

express their feelings.  (Tr. at 269:0-16, 315:9-24, 623:14-624:2.)  Kaplan utilizes the Reading

---

[4] The 8:1+2 designation indicates I.J.B.'s class had eight students, one teacher, and two
teaching assistants.  (Tr. at 314:23-315:4.)

Mastery, Language for Learning, i-Ready, and Edmark reading systems.  (*Id*. at 313:13-314:4, 316:13-317:15.)

DiMuccio testified that parents are reminded on a monthly basis that they can participate in counseling and training, but L.J.B. never utilized such services or complained to DiMuccio about not having access to training prior to filing the Due Process Complaint ("DPC") that led to this case.  (*Id*. at 319:14-320:15.)  Sara Christman, Kaplan's school psychologist, also stated that the Parent received these monthly reminders but never took Kaplan up on its offer of training.  (*Id*. at 403:4-405:23.)  Christman has fourteen years of experience as a school psychologist, obtained a certificate of advanced study and ABA from Hunter College, and is trained in developing functional behavioral assessments ("FBA"s).  (*Id*. at 378:17-379:2, 379:7-12, 399:4-7, 400:12-15.)

### 2.    2016-2020 School Years at Kaplan

Starting in 2015 and through 2017, Tiffany Rosenthal was I.J.B.'s teacher at Kaplan.  (*Id*. at 750:13-18; D's 56.1 Stmt. ¶ 26.)  According to Rosenthal, I.J.B. exhibited disruptive behaviors, which "didn't occur every day and they were far out, they were spread out and the strategies [she] put into place seemed to work for him."  (Tr. at 753:10-14.)  These strategies included utilizing a timer to manage his time, giving him a token board, and implementing a secondary reinforcement/check system.  (*Id*. at 753:15-754:2, 755:17-25.)  During the 2017-18, 2018-19, and 2019-20 school years, Dorene Weisberg was I.J.B.'s teacher.  (*Id*. at 854:19-24; D's 56.1 Stmt. ¶ 32.)  In both Rosenthal's and Weisberg's classes, I.J.B. had access to assistive technology ("AT") to help with communication via an iPad that, for the 2016-2018 school years, had the application Proloquo2Go, and, for the 2018-2020 school years, had the application

LAMP Words for Life ("LAMP").  (Tr. at 758:23-759:4, 760:7-10, 761:2-8, 867:16-20, 868:23-869:8.)

For the years at issue, each of I.J.B.'s IEPs stated, among other things,[5] that he needed "strategies, including positive behavioral interventions, supports and other strategies to address behaviors that impede the student's learning or that of others."  (D's Ex. 1 at 9; D's Ex. 3 at 11; D's Ex. 4 at 12; D's Ex. 10 at 11; D's Ex. 17 at 13.)

### a.   2016-2017 School Year

On April 19, 2016, the East Ramapo CSE met and recommended that for the 2016-2017 school year, I.J.B. should be placed in the 8:1+2 social communication class, and receive speech/language, occupational therapy ("OT"), and physical therapy ("PT") services.  (D's Ex. 1 at 13-14.)  On March 2, 2017, the District's CSE met to discuss I.J.B.'s transfer to the District.  (D's Ex. 3 at 1.)  The CSE accepted the East Ramapo IEP for the remainder of the school year and noted that he had made a positive transition to Kaplan, was able to work independently, and sometimes engaged in aggressive behaviors when he did not get what he wanted but that those behaviors had decreased.  (*Id.*)  Both the East Ramapo and District IEPs outlined two reading, two writing, three mathematics, two speech/language, one social/emotional/behavioral, four motor, and one basic cognitive/daily living goals.  (*Id.* at 11-15; D's Ex. 1 at 9-13.)  Both IEPs said I.J.B. needed strategies to address his behaviors but did not need a behavioral intervention plan ("BIP"), and that he needed an AT device, which the CSEs recommended also be used at home.  (D's Ex. 1 at 9; D's Ex. 3 at 11.)  During the 2016-2017 school year, he used an iPad with the Proloquo2Go software.  (D's Ex. 3 at 7.)  DiMuccio and Rosenthal testified that prior to

---

[5] The below discussion of I.J.B.'s IEPs will focus on the specific issues raised by the Parent in this case – namely, his AT needs and behavioral management.

transferring to North Rockland, but while he was attending Kaplan, I.J.B. had an iPad with Proloquo2Go at home, but he would only sometimes bring to it school and often deleted the application from the iPad.  (Tr. at 343:19-344:9, 759:2-760:3; *see id.* at 654:24-655:21.)  If he did not bring the device to school, he would be given a device in school that also had Proloquo2Go programmed on it.  (*Id.* at 759:2-761:7.)  He received (1) individual speech and language therapy twice a week for 30 minutes, (2) small group speech and language therapy once a week for 30 minutes, (3) OT twice a week for 30 minutes, and (4) PT once a week for 30 minutes.  (D's Ex. 1 at 1; D's Ex. 3 at 1.)

        b.     <u>2017-2018 School Year</u>

On April 28, 2017, the District CSE met and recommended for the 2017-2018 school year that I.J.B. continue with the 8:1+2 class at Kaplan, and receive speech/language, OT, and PT services.  (D's Ex. 4 at 1-2.)  The CSE noted that he had made progress in his ability to follow classroom routines, work independently, interact with peers, and understand word and number basics, but that he continued to require assistance and development to increase his communication.  (*Id.* at 1.)  His IEP outlined one reading, two writing, two mathematics, three speech/language, one social/emotional/behavioral, five motor, and two basic cognitive/daily living goals.  (*Id.* at 3-4.)  During the 2017-2018 school year, I.J.B. received (1) individual speech and language therapy once a week for 30 minutes, (2) small group speech and language therapy twice a week for 30 minutes, (3) OT twice a week for 30 minutes, and (4) PT once a week for 30 minutes.  (*Id.* at 1.)  His IEP again indicated that he needed strategies to address his behaviors but did not need a BIP, and that he needed an AT device, which the CSE recommended also be used at home.  (*Id.* at 12-13.)  During the 2017-2018 school year, he had access at school to an iPad with Proloquo2Go and Speak4Yourself, (D's Ex. 10 at 8), but was not

able to bring it home because of his having in the past deleted programs while at home, (Tr. at 343:12-14, 343:19-344:2).

On February 6, 2018, BOCES conducted a psychological reevaluation of I.J.B.,[6] which found moderate delays in his full-scale IQ (Standard Score of 43), nonverbal IQ (Standard Score of 47), and verbal IQ (Standard Score of 44), scores that fell below the .1 percentile, (D's Ex. 5 at 1-2), and age-equivalent scores ranging between three and five on the Vineland-3 CTF measure of adaptive functioning, (*id.* at 4).[7]

According to I.J.B.'s April 12, 2018 Educational – Annual/Reevaluation Report, which summarized his academic and social progress, Weisberg indicated, among other things, that he was social and friendly, was able to follow classroom rules, and responded well to use of a token board to reward good behavior. (D's Ex. 6 at 1-3.) She noted that he requires "constant praise and behavioral management strategies," (*id.* at 1), and that his aggressive behavior when frustrated had decreased, (*id.* at 3).

According to I.J.B.'s OT Annual Reevaluation Report from April 16, 2018, written by Angela Ciampoli, he was able to carry out most daily living skills independently and follow two-step directives, understood basic self-help skills, and worked well in structured environments with daily routines. (D's Ex. 7 at 1.) Ciampoli noted he "[c]an become aggressive and non-compliant when he is upset, frustrated, or is unable to convey a need," and "[m]ay head butt,

---

[6] Per the IDEA, schools must conduct "a reevaluation of each child with a disability" "not more frequently than once a year, unless the parent and the local educational agency agree otherwise" and "at least once every 3 years, unless the parent and the local educational agency agree that a reevaluation is unnecessary." 20 U.S.C. § 1414(a)(2)(A)-(B).

[7] "The Vineland-3 CTF is an individually administered measure of adaptive behavior for ages 3 through 21" that "provides a comprehensive assessment of communication, practical daily living skills, and relating to others for students in school." (D's Ex. 5 at 3.)

bite, grab/hit/spit or kick a person closest to him when having a behavioral episode," and "[w]orks best in [a] quiet environment with [a] reward system as [an] incentive to complete tasks."  (*Id.* at 2.)  She also noted that these behaviors fluctuate and depend on how his day is going.  (*Id.*)  The "management needs" cited by Ciampoli include "a structured and routine environment."  (*Id.*)  She noted that he had attained 80% success in two of his OT-related IEP goals and 70% success in the other.  (*Id.* at 3.)

Lori Guarascio – I.J.B.'s physical therapist for the 2016-2017, 2017-2018, and 2019-2020 school years, (Tr. at 465:20-25) – noted in her April 18, 2018 PT Annual Review Report that he had achieved his two PT-related goals and that "[v]erbal and/or tactile prompts as well as praise will improve his gross motor performance," (D's Ex. 8 at 1-2).

Elena Temple and Denis Bergin, speech and language therapists at Kaplan, completed his April 18, 2018 Speech/Language Annual Review-Revaluation Report.  (D's Ex. 9.)  They noted that he had achieved two of his relevant IEP goals but struggled with the third.  (*Id.* at 3.)  Although "essentially non-verbal," (*id.* at 1), typically responding with one-word verbalizations, he was able to formulate longer responses with the help of an augmentative and alternative communication ("AAC") device – the iPad loaded with the Proloquo2go and Speak4Yourself applications – which he navigated "with ease," (*id.* at 2).  They noted that he could become frustrated when not understood or not going first in a group, but that he could be redirected and would return to the task.  (*Id.* at 3.)

According to I.J.B.'s 2017-18 Progress Report for Goals and Objectives, I.J.B. achieved fourteen of the sixteen goals set out in his IEP, (*see generally* D's Ex. 37); for the remaining two goals, he was progressing inconsistently for goal 7 (speech/language) and progressing satisfactorily for goal 14 (motor), (*id.* at 7, 13).

                c.      2018-2019 School Year

The CSE met on May 18, 2018 to discuss I.J.B.'s progress during the 2017-2018 school

year and recommended that for the 2018-2019 year, he should continue his 8:1+2 class and

receive speech/language, OT, and PT services.  (D's Ex. 10 at 1.)  It also recommended an

extended school year program and indicated that his parents would be offered counseling and

training once a month.  (*Id.*)  The IEP noted that his teacher had reported that

> [m]ost of the time [I.J.B.] is very happy . . . .  At times [he] will show aggressive
> behaviors especially if he wants something that he cannot have.  At this time I do see a
> decrease of these behaviors.  He is learning to raise his hand and ask for help when he
> doesn't understand the skill or if he is upset about something.  [I.J.B.] understands that
> when he completes his work he will earn ten tokens and he can then play with a toy of his
> choice.

(*Id.* at 9.)  The IEP also noted the need for behavioral strategies and the effectiveness of the

token board.  (*Id.* at 7.)  His IEP outlined one reading, two writing, one mathematics, three

speech/language, one social/emotional/behavioral, four motor, and one basic cognitive/daily

living goals.  (*Id.* at 2-3.)  During the 2018-2019 school year, he received (1) individual speech

and language therapy twice a week for 30 minutes, (2) small group speech and language therapy

twice a week for 30 minutes (an increase from the previous year), (3) OT twice a week for 30

minutes, and (4) PT once a week for 30 minutes.  (*Id.* at 1; Tr. at 288:20-289:12.)  His IEP again

indicated that he needed strategies to address his behaviors but did not need a BIP, and that he

needed an AT device, which the CSE recommended also be used at home.  (D's Ex. 10 at 11-12.)

It also noted the benefits to I.J.B. from using the iPad with Proloquo2Go and Speak4Yourself.

(*Id.* at 8.)

        On October 19, 2018, the Parent wrote a letter, requesting that I.J.B. be evaluated for

augmentative communication because "[i]t is so hard for him to communicate."  (D's Ex. 11.)  In

October and December 2018, Temple[8] conducted an AT evaluation for I.J.B., (D's Ex. 13 at 1; *see* Tr. at 637:23-638:3), and recommended that he switch communication applications from Proloquo2Go to LAMP, because while using LAMP, "[h]e was able to formulate grammatically correct sentence[s] and combine icons to make longer sentences.  He really had no trouble at all with this . . . .  [She] felt it was the better one for him to use," (Tr. at 650:2-20; *see* D's Ex. 13 at 4).  Temple testified that after the evaluation, I.J.B. was provided with an iPad with the LAMP application loaded on it.  (Tr. at 651:11-652:3.)

According to Leslie Klayman, I.J.B.'s speech and language pathologist for the 2018-2019 and 2019-2020 school years, (*id*. at 541:16-24), I.J.B. had access to the LAMP application on his iPad, which he used independently, (*id.* at 553:4-25), and was "very good at," (*id.* at 558:16-18).  While he could communicate better when he had his device, (*see id.* at 684:19-21), Temple testified that even without any device, I.J.B. was able "to do things like make requests," (*id*. at 684:8-10).  For example, "He would attempt to verbalize, he would provide a verbal approximation, he would point, gesture, bring you to the location if he needed something that he couldn't reach.  He tried his very best to make his wants and needs known if he didn't have anything to support him."  (*Id.* at 684:12-18.)

Weisberg testified that the 2018-2019 school year was particularly difficult for I.J.B., and he sometimes exhibited disruptive behaviors because "there was a particular staff member in the class that he only wanted to work with, and when he wasn't assigned to her, sometimes the behaviors would escalate."  (*Id.* at 861:15-19; *see id.* at 864:23-865:6.)  During this year, he had eight behavioral incidents.  (*Id.* at 339:11-15.)  To address his behaviors, teachers implemented

---

[8] Temple testified that she believes she oversaw I.J.B.'s speech and language group therapy during the 2017-18 school year but was not certain.  (Tr. at 622:11-15.)

different strategies – including holding up a stop sign, using an okay board, or having him count to ten, ask a teacher for help or take a deep breath – which led to a decrease in some of his behaviors by the end of the year.  (*Id.* at 861:22-862:16, 864:23-865:6.)  Both Christman and Weisberg noted that I.J.B. responded positively to a checklist reward system and constant positive reinforcement.  (*See id.* at 402:6-13, 420:4-15, 866:8-17.)  According to Principal DiMuccio, I.J.B.'s behaviors – including biting, hitting, and screaming – subsided and he did not require an FBA.  (*Id.* at 352:25-353:11.)  Weisberg agreed that the incidents were not of sufficient frequency and duration to warrant an FBA and that the strategies in place were effective to manage I.J.B.'s behavior in class.  (*Id.* at 866:4-19.)

In his I.J.B.'s February 28, 2019 Educational Report, Weisberg indicated that he participated in all group lessons; worked well for praise, attention, and various reinforcers; had good listening and receptive skills; communicated his needs and wants; had many interests; enjoyed going out in the community; and was extremely aware of his surroundings.  (D's Ex. 14 at 2-3.)  She found he needed to improve his handwriting, math, sequencing, and spelling skills; learn to wait for a preferred item, not get frustrated when a peer has an item that he wants, and not be aggressive when he receives a less desired item; not worry about what his peers are doing; and be able to work with all staff members.  (*Id.*)  She noted that he was "learning that it is ok to wait to be called on," and that behavioral strategies are used when his not getting chosen prompts a tantrum.  (*Id.* at 1-2.)  As to his IEP goals, Weisberg indicated he had achieved three goals, was working on another, and had not achieved two, which "will be repeated again for the 2019-2020 school year."  (*Id.* at 4-5.)

According to a March 4, 2019 Speech Language Annual Review Report written by Klayman, I.J.B.'s progress toward his three goals was good, he needed to use his AAC device to

communicate more independently, and when he yelled, cried or grabbed, he responded to redirection.  (*See generally* D's Ex. 16.)

According to Guarascio, I.J.B.'s physical therapist for the 2018-19 school year, Daniella Servidio, expressed concern that the Parent was unable to make sure he attended school with his prescribed orthotics.  (Tr. at 465:17-468:13.)  The orthotics – which I.J.B. could put on independently – were left at school so the staff could make sure he would have access to them, because otherwise they "frequently would not come back into school for a period of time."  (*Id*. at 468:4-17.)

I.J.B.'s 2018-19 progress report reflects that he achieved nine of his thirteen goals; for the remaining four goals, he was progressing gradually for goal 4 (math) and goal 12 (balance/motor skills), progressing satisfactorily for goal 8 (social), and inconsistently progressing for goal 13 (basic cognitive/daily living).  (D's Ex. 38 at 5, 9, 13-15.)

### d.   2019-2020 School Year

The CSE met on April 23, 2019 to discuss I.J.B.'s progress during the 2018-2019 school year, and it recommended that, for the 2019-2020 year, he should continue his 8:1+2 class for an extended school year, and receive speech/language, OT, and PT services.  (D's Ex. 17 at 1-2.)  It indicated that his parents would be offered counseling and training once a month and that a speech/language consultation would be provided to assist with programming his communication device.  (*Id*.)  His IEP outlined two reading, three mathematics, two speech/language, three social/emotional/behavioral, and four motor goals.  (*Id.* at 3-4.)  During the 2019-2020 school year, he received (1) individual speech and language therapy twice a week for 30 minutes, (2) small group speech and language therapy twice a week for 30 minutes, (3) occupational therapy twice a week for 30 minutes, and (4) physical therapy once a week for 30 minutes.  (*Id.* at 1.)

His IEP again indicated that he needed strategies to address his behaviors but did not need a

BIP), and that he needed an AT device but, unlike in prior years, the IEP did not recommend that

the device be used at home.  (*Id.* at 13.)  The IEP noted I.J.B.'s increasing use of AT to foster

communication; that he needed to be reminded to use strategies to manage his outbursts; that

while he was usually able to calm down when upset, a pattern of aggression when he was jealous

or could not have something he wanted was escalating and starting to interfere with his progress.

(*Id.* at 1, 9-11.)

For the 2019-2020 school year, I.J.B.'s class featured the push-in model, (Tr. at 383:19-

384:18), meaning "related services are actually pushing into the classroom, working in tandem

with a classroom teacher and students in a real-life setting," instead of having students "be pulled

out and brought to a related service provider's office or different settings within the building,"

(*id.* at 397:20-23, 398:2-4).

On September 13, 2019, the Parent wrote to Principal DiMuccio to express her

disagreement with I.J.B.'s evaluations and annual reports from 2018.  She wrote,

> I disagree with these evaluations because they lacked sufficient standardized assessments
> and recommendations necessary to implement appropriate services for [I.J.B.].  The
> Occupational Therapy and Physical Therapy reports did not contain any
> recommendations for services to help [I.J.B.], and the Speech/Language Evaluation
> describes [I.J.B.] as 'essentially nonverbal' but does not state how to help [I.J.B.]
> progress.  Moreover, I disagree with the failure to conduct an assistive technology and
> neuropsychological evaluation.

(P's Ex. EE at 1.)  The Parent requested the following Independent Educational Evaluations

("IEE"s) at the District's expense:  a neuropsychological evaluation by Dr. Peter Piegari; a

speech and language evaluation by Rachel Bouvin Speech Services ("RBSS"); an AT evaluation

by RBBS; an OT evaluation by RBBS; a PT evaluation by RBBS; and an FBA by a BCBA at

Manhattan Psychology Group.  (*Id.* at 1-2.)  On October 2, 2019, the CSE met to discuss the

Parent's requests and Taryn Soto, the Director of Special Services, approved the IEEs, but "not

specifically the people that [the Parent] had in mind," and told the Parent that she "would send

her more information after and [they] would discuss it from there."  (Tr. at 214:5-12.)  The CSE

also recommended that I.J.B.

> continue his current classification of Multiple Disabilities with placement in a Special
> Class (8:1:2) in the Jesse Kaplan School.  [He] will receive Speech or Language,
> Occupational and Physical Therapy as related services with Parent Counseling and
> Training being offered once monthly.  [He] will continue to have his Assistive
> Technology device with a Speech or Language Consultation.  [The Parent] was in
> agreement with [I.J.B.'s] program at this time, but will wait for the outcome of the
> independent evaluations for further discussion.

(P's Ex. E at 2.)  Following the meeting, Soto sent the Parent information about the District's

rates and policy regarding IEEs.  (Tr. at 214:13-22.)

During the 2019-2020 school year, at least up until March 2020, I.J.B. had no reported

behavioral incidents.  (D's 56.1 Stmt. ¶ 74; Tr. at 355:6-11.)  According to Weisberg, I.J.B. did

not have as many outbursts during that year, was able to work with all of the different teachers in

the classroom, (Tr. at 881:22-882:11), "was able to start sharing more . . . with his classmates,

[and] was able to interact more with his classmates," (*id.* at 882:3-6).  He had successfully used

behavioral strategies – including the token board, counting to ten, taking deep breaths, and

asking a teacher for help – and was able to use a more sophisticated token system where he made

the check marks himself.  (D's 56.1 Stmt. ¶¶ 71-72.)

On January 27, 2020, Guarascio recommended that I.J.B.'s PT be discontinued for the

2020-2021 school year, (*see* D's Ex. 20 at 1), because

> [h]e was functional in every area of the school building, the school setting that we needed
> him to be in, independent with his orthotics.  He only needed verbal cuing to perform his
> exercises, or there was no need – there was nothing interfering with his gross motor
> abilities to access his education in any way,

(Tr. at 471:12-18).  According to Guarascio, he could walk, handle stairs, navigate school, and handle his iPad with ease; had good gross motor skills; and never got hurt in school.  (*See id.* at 467:7-18, 469:20-23, 472:13-18, 472:25-473:9, 476:11-478:22, 486:13-20, 500:23-24.) Guarascio testified that she spoke with the Parent on January 23, 2020, informing her about the recommendation, which "appeared to be well understood" by the Parent who "said she will speak with her husband." (D's Ex. 20 at 1.)  I.J.B. continued to receive PT for the remainder of the 2019-2020 school year.  (D's 56.1 Stmt. ¶ 70.)

On March 13, 2020, due to the COVID-19 pandemic and the Governor's Executive Order, schools were physically closed and distance learning began.  (Tr. at 205:5-6, 390:18-20, 653:15-20, 717:5-8.)  As a result, I.J.B. received virtual PT.  (*See id.* at 347:19-22, 469:16-19.) According to Christman, I.J.B.'s parents were invited via email to parent counseling and training post-COVID but did not contact her about – or otherwise avail themselves of – this opportunity. (*Id*. at 405:5-406:6.)

Principal DiMuccio testified that during I.J.B.'s time at Kaplan, there were no reports that he was not safe and there is no evidence of him sustaining any injury.  (*Id*. at 331:7-17.)  Theresa Durney, I.J.B.'s occupational therapist at Kaplan, (D's 56.1 Stmt. ¶ 60), testified that she was told that I.J.B. does not have glasses, even though his records indicate that he is supposed to wear glasses, (Tr. at 735:23-736:4).

I.J.B.'s 2019-2020 progress report reflects that, as of the start of the pandemic, he had achieved seven of his fourteen goals and for the remaining seven goals, he achieved 80% accuracy for goal 3 (math), achieved all benchmarks up until April for goals 4 and 5 (math) and 11 and 12 (motor skills), and was progressing satisfactorily for goals 13 and 14 (motor skills). (D's Ex. 39 at 1-14.)

### 3. The IEEs

In February and March 2020, I.J.B.'s IEEs were completed, except for the independent

FBA.[9] (*See generally* D's Ex. 21-25.)

### a. Neuropsychological Evaluation

Dr. Peter Piegari conducted the neuropsychological IEE, evaluating I.J.B. for over six

hours over the course of three sessions in March 2020. (D's Ex. 25 at 1; D's 56.1 Stmt. ¶¶ 114-

15.) Piegari concluded that I.J.B.'s "cognitive functioning is complicated by severe impairments

in his expressive language and articulation" and "[c]ommunication deficits have contributed to

significant delays in adaptive and academic skills." (D's Ex. 25 at 14.) He diagnosed him with a

mild intellectual disability but noted he should be reassessed after he has been trained in using an

AAC device. (*Id.*) He also noted that I.J.B.'s "progress has been curtailed by an inappropriate

educational placement and insufficient services." (*Id.* at 15.) Based on his evaluation, Piegari

recommended, among other things, that I.J.B. be placed in a program that provides emotional,

behavioral, and academic support to students with communication disorders, which would likely

be a private school; that he receive special education instruction for one hour five days a week at

home and an additional two hours of speech/language therapy a week; that he be evaluated by a

pediatric neurologist and undergo speech/language, AT, OT, and PT evaluations; and that his

parents receive one hour per week of training at home. (*Id.* at 16-18.)

Because of the pandemic, Dr. Piegari could not conduct an evaluation at Kaplan, (P's

56.1 Resp. ¶ 119), but in addition to not having observed I.J.B. in a school setting, Dr. Piegari

did not know what school I.J.B. attended, did not communicate with anyone from Kaplan, was

---

[9] The independent FBA, although granted, could not be completed due to the COVID-19 pandemic. (D's 56.1 Stmt. ¶ 113.)

not familiar with I.J.B.'s class schedule or how his teachers worked with him individually, did

not have documents discussing whether I.J.B.'s behaviors increased or decreased from October

2019 to March 2020, and did not know how Kaplan had incorporated the use of AT, (Tr. at

1004:9-13, 1005:7-23, 1007:4-9, 1008:11-19, 1010:11-1011:5, 1011:18-20, 1014:10-14; *see* D's

56.1 Stmt. ¶¶ 119-120).[10]  Although he did not administer a cognitive (IQ) assessment, he

determined that I.J.B.'s full scale IQ was very low.  (D's 56.1 Stmt. ¶¶ 116-117.)  Dr. Piegari

conceded that he was not a licensed or certified speech pathologist, speech therapist, physical

therapist, or occupational therapist, (Tr. at 1007:25-1008:10), but he made recommendations

about the proper duration, rate, and frequency of those services, (*see* D's Ex. 25 at 16-18).

        b.    PT Evaluation

On February 27, 2020, Jessica Fan conducted I.J.B.'s PT IEE.  (*See* D's Ex. 24 at 1, 7.)

She found that I.J.B. had significant delay in developing his gross motor skills compared to his

peers, overall presented with poor functional mobility, and had deficits that led him to ambulate

in his environment with an abnormal gait pattern, which put him at risk for tripping and falling.

---

[10] Various Kaplan staff members testified that the Parent asked them to complete teacher forms that would then be shared with Dr. Piegari, and that they were completed and returned to the Parent before the COVID-19 shutdown.  (Tr. at 394:2-8, 413:19-414:3, 886:18-887:21.)  But Dr. Piegari did not receive these forms.  (*Id.* at 1005:7-16.)  Defendant states that Plaintiffs never provided the forms to Dr. Piegari, (D's 56.1 Stmt. ¶ 118), which Plaintiff disputes on the ground that "Dr. Piegari testified that he never received the forms back from the school," (P's 56.1 Resp. ¶ 118).  Dr. Piegari testified, "I did ask the teachers to complete [the forms].  I think that was probably a little bit scuttled or complicated, I didn't get them back because of the whole COVID crisis and school being upended."  (Tr. at 963:12-16.)  It is plain that Dr. Piegari was saying he never got the teachers' forms but was not expressing a view on whether that was the fault of the Parent or the teachers.  In any event, when asked, "Because they weren't received, did you ever try to follow up with them to try to get if nothing else anecdotal information or maybe administer the forms over the phone in case there was any complications to doing it in person because of COVID?" Dr. Piegari responded, "I did not."  (*Id.* at 1005:17-23.)

(*Id.* at 6-7.)  She recommended he receive individual PT twice a week for 30 minutes and compensatory individual PT services once a week for 30 minutes for two school years.  (*Id.* at 7.)

When Fan evaluated I.J.B., he did not have his orthotics.  (*Id.* at 3.)  In her evaluation, Fan writes, "[the Parent] feels that he should not have stopped physical therapy services in school as she believes that he continues to need physical therapy services," (*id.* at 1), but at the time of the evaluation, I.J.B. was still receiving PT services, which continued until the end of the 2019-2020 school year, (Tr. at 297:23-298:5, 347:15-22).  Because of the pandemic, Fan did not observe I.J.B. in the school setting or speak to Guarascio to understand his abilities at school. (*Id.* at 487:3-12; P's 56.1 Resp. ¶ 129.)

c.    <u>OT Evaluation</u>

On March 4, 2020, Lauren Lico conducted the OT IEE.  (D's Ex. 21 at 1.)  Standardized testing revealed that I.J.B. has many deficits, including manual coordination, balance, strength and agility, visual perception, and sensory processing.  (*Id.* at 16.)  She recommended, "[b]ased on his age, fine motor control, and graphomotor performance," that I.J.B. "should use a keyboard and assistive technology to type all academic work and reduce physical demands."  (*Id.* at 7.) She concluded that he requires compensatory methods to complete daily activities and AT and accommodations in order to make academic progress.  (*Id.* at 17.)  She recommended that I.J.B. receive three OT sessions per week for 30 minutes, 184 hours of compensatory OT services, and a comprehensive vision examination.  (*Id.* at 18.)

Tsekouras testified that two of the assessments Lico administered, (*see id.* at 1), were inappropriate because they are aimed at children with higher cognitive levels, (Tr. at 834:7-20). In addition, I.J.B. did not wear his glasses during one evaluation, (*see* D's Ex. 21 at 2), which Tsekouras testified would impact the results, (Tr. at 817:9-16, 817:25-818:4).  Tsekouras also

19

disagreed with Lico's view on handwriting, stating, "I think his writing is improving and he shouldn't be limited to a keyboard or assistive technology," and noting that by improving their handwriting, students learn other skills such as dexterity and motor control, and improve their grasp, coordination, and motor planning. (*Id*. at 815:14-816:9.) Lico conceded that handwriting is a fine motor skill that requires visual coordination, scanning in multiple directions, posture, core strength, and upper body proximal muscle control. (*Id.* at 1163:6-1164:3.)

During his evaluation, I.J.B. did not wear his orthotics. (D's Ex. 21 at 2.) Lico testified that his parents did not have a specific answer as to why, but that orthotics are typically not worn during therapy for strengthening or agility, (Tr. at 1165:12-1166:10), although she did not know why I.J.B. had been prescribed orthotics, (*id.* at 1166:11-17).

Lico also never observed I.J.B. in a school setting because of the pandemic, did not contact anyone from the school to discuss the results of the sensory assessment, and is not familiar with the Kaplan school grounds. (P's 56.1 Stmt. ¶ 135.) Although Lico is "an ongoing service provider at a sensory clinic" and "treat[s] children who go to public school," (Tr. at 1171:19-1172:3), she has never provided occupational therapy services to students in a public-school setting, (D's 56.1 Stmt. ¶ 137).

d.      Speech/Language Evaluation

On March 10, 2020, Marlene Morrow conducted I.J.B.'s speech and language IEE. (D's Ex. 23 at 1.) Morrow is a New York State licensed speech and language pathologist, but not a certified classroom teacher for public schools. (Tr. at 1042:10-12, 1095:17-1096:13; D's 56.1 Stmt. ¶ 148.) Morrow found that I.J.B. has severe delays and deficits in all areas of expression and gross language skills, which were compromising his academic performance and putting him at risk for delayed language functioning, but believed that if he received consistent and quality

access to a speech-generating device and training, he would experience an exponential growth in his language skills.  (D's Ex. 23 at 11-12.)  She recommended that he receive individual speech therapy four times a week for 30 minutes; specialized reading instruction at school and home, preferably using the Orton-Gillingham approach;[11] daily independent reading time for 30 minutes; access to an AAC device; and 184 hours of compensatory services.  (*Id.* at 12-13.)

According to Kim Keill, the District CSE chairperson who has 28 years of experience as a special education teacher and has been trained in the Orton-Gillingham approach, (D's 56.1 Stmt. ¶ 145), it would not be appropriate for I.J.B.:

> There might be components of the Orton-Gillingham program strategies that would be appropriate for him, but not the program as it is with fidelity. . . .  [This is because] [y]ou have to be cognitively intact, you have to be able to manipulate sounds and phonemes, be able to coordinate your verbal knowledge of letters, sounds and words with fluency as well as coordinate a writing component as well,

(Tr. at 1346:18-1347:6).  Morrow acknowledged that I.J.B.'s cognitive functioning range was in the low to below-average range.  *(Id.* at 1105:21-24.)

During the evaluation, Morrow allowed I.J.B. to use a communication device, which precluded the use of any norm-referenced quantifiable data and deviated from assessment protocols.  (*Id.* at 1047:18-1048:7, 1093:18-1094:18; *see* D's 56.1 Stmt. ¶ 141.)  According to Klayman, I.J.B.'s speech and language pathologist, Morrow never contacted her, even though Morrow evaluated I.J.B. before COVID.  (Tr. at 546:20-547:3.)  Klayman also testified that I.J.B.'s evaluation was conducted at home, but "behaviors are certainly different at home, depending on what's going on around them."  (*Id.* at 549:21-550:15; *see* D's 56.1 Stmt. ¶ 151.)

---

[11] "Orton-Gillingham is a multi-sensory approach to learn language.  It is very specific, . . . it's leveled, so it is an intense system that is applied to the individual to teach literacy skills." (Tr. at 1060:9-14.)  Morrow is not trained or certified in the program.  (*Id.* at 1108:11-14.)

e.      AT Evaluation

Morrow also conducted I.J.B.'s AT IEE on March 10, 2020.  (D's Ex. 22 at 1.)  She

concluded that I.J.B. functions below his cognitive level and has a hard time expressing his

wants and needs, so he requires the use of a speech-generating device.  (*Id.* at 3.)  Morrow

exposed him to a variety of devices and programs to determine which was best suited to his

needs, and ultimately recommended he use an iPad 9.7 with the TouchChat HD-AAC with

WordPower Speech Application.  (*Id.* at 6-7, 11.)  She also recommended that his parents be

trained on the care and use of the device, and that Partner Augmented Input ("PAI") – a method

by which I.J.B.'s communication partners also use the device – be implemented.  (*Id.* at 7-8.)

During the evaluation Morrow also utilized the LAMP application, which I.J.B. had been

using previously, and testified he was able to navigate it and "did well."  (Tr. at 1075:16-18.)

But when she "introduced the WordPower 108 library, he did phenomenal. . . . [H]e was able to

use this device, he chose a preference of this device," and had a "[b]etter ability to communicate

using the WordPower than he did with the LAMP."  (*Id.* at 1075:16-22, 1085:7-9.)  His

preference was important not only to avoid tantrums, Morrow testified, but also to avoid "device

abandonment," which can occur if the device is not a right fit or if the student has not received

the proper training to use it.  (*Id*. at 1077:20-1078:5, 1082-24-1083:5, 1085:10-1086:4.)

Temple testified that she disagreed with Morrow's findings.  During her December 2018

evaluation of I.J.B., she had found TouchChat was less effective than LAMP, (*id*. at 661:23-

662:3; D's Ex. 13 at 3), and believed that I.J.B.'s preference for TouchChat during the IEE arose

not from the efficacy of the app itself, but from the fact that he happened to be using it during an

exchange with his mother in which he was able to communicate that he wanted pizza, (Tr. at

660:3-662:8; *see* D's Ex. 22 at 3).  Temple believed LAMP was appropriate for students like

I.J.B. with motor planning problems.  (Tr. at 643:5-644:9.)  Klayman also testified that I.J.B. has

not had any difficulties with his iPad and the programmed applications, including using the touch

screen, swiping in different directions, pointing at icons, opening applications, and navigating to

the home screen.  (*Id.* at 554:7-555:3.)  The LAMP application allows I.J.B. to program his own

buttons, (*id.* at 697:12-16), and Weisberg stated he was doing well with this application, (*id*. at

871:14-21).

### 4.    Review of the IEEs by the District

On June 1 and 11, 2020, the CSE met to conduct I.J.B.'s annual review.  (D's Ex. 31 at 1-

3; Tr. at 199:5-200:2.)  Soto testified that at the meeting, the CSE reviewed and considered the

recommendations sort forth in the IEEs, (D's Ex. 31 at 1, 3; Tr. at 222:8-11), and Christman

testified they also discussed that parent counseling and training had been offered but was not

utilized, (Tr. at 406:16-24).  Keill testified that at CSE meetings, she typically asks parents

"anywhere from six to probably ten times if they have any questions, concerns or anything else

they would like to add or ask," (*id*. at 271:11-15; *see id.* at 270:23-271:18), and Plaintiff

indicated at the June 2020 meetings that she did not have any questions or concerns about the

information being presented or the CSE's final recommendations for the 2020-2021 school year,

which included (1) continuing his classification of "multiple disabilities" and placement in the

8:1+2 class; (2) receiving both individual speech and language therapy and individual OT twice a

week; (3) discontinuing PT, based on I.J.T.'s ability to independently navigate the school

environment; (4) offering parent counseling and training once a month; and (5) providing a

speech and language consultation once a week, one two-hour AT consultation for the family, and

technology consultations three times weekly for 30 minutes for the family.  (D's Ex. 31 at 3).

The IEP noted that in several respects – specifically, independence, compliance, expression, and

communication – I.J.B.'s teachers observed a higher level of functioning than had been reported in the IEEs.  (*Id.* at 2-3.)  It also observed that he communicated his wants and needs with the iPad and LAMP application, (*id.* at 2), that his behavior was more compliant, and that he was better able to use learned strategies when upset, (*id.* at 3).  The IEP indicated that he needed strategies to address his behaviors but did not need a BIP, (*id.* at 15), and that he needed an AT device, which the CSE recommended also be used at home, (*id.* at 16).

### B. Procedural History

#### 1. DPC

On November 19, 2019, the Parent, through counsel, filed a DPC alleging that the District denied I.J.B. a FAPE for the 2017-2018, 2018-2019, and 2019-2020 school years.  (P's 56.1 Stmt. ¶ 18; D's Ex. 18 at 7.)  Plaintiff asserted the District failed to (1) comprehensively evaluate I.J.B., (2) appropriately respond to Plaintiff's IEE letter, (3) provide Plaintiff with sufficient Prior Written Notice ("PWN") as to what information the CSE used as a basis for its recommendations when developing I.J.B.'s IEPs, (4) provide I.J.B. with an appropriate placement, (5) develop and implement an effective BIP, (6) develop meaningful and measurable goals for I.J.B., (7) recommend appropriate related services, and (8) provide I.J.B. with an appropriate AT device and training.  (D's Ex. 18 at 4-6.)  Plaintiff requested a Due Process Hearing and the following relief:  (1) a finding that the District denied I.J.B. a FAPE for the years in question; (2) a hearing addressing the IEEs and ordering the District to fund neuropsychological, speech and language, AT, OT, and PT IEEs and an FBA; (3) an order that the CSE meet to review the results of the IEEs and develop an appropriate IEP; (4) an order that the District fund compensatory education services relating to speech and language therapy, OT, and PT; (5) an order for AT device training for the student and the Parent; (6) an appropriate

placement for the student in an approved non-public school, if found necessary by the evaluations; (7) an order that the District provide the Parent with "appropriate PWNs that specify all records and reports used as the basis for proposed actions"; (8) an order that the District provide a Creole interpreter at all meetings discussing the student's education; and (9) any other relief deemed appropriate. (*Id.* at 7-8.)  The DPC was filed after the IEEs were approved but before they were obtained, and Plaintiff never subsequently amended the DPC to challenge the District's review of the IEEs. (D's 56.1 Stmt. ¶ 173.)  The DPC also did not include any request for tuition for I.J.B.'s prospective placement at Shrub Oak. (*Id.* ¶ 172.)

After the DPC was filed, the District held a resolution meeting between Soto and Plaintiff, but according to Soto, the Parent "refused to participate in the meeting . . . .  [S]he refused to basically speak to [Soto] during the meeting." (Tr. at 227:19-228:3.)

## 2.   Impartial Hearing Officer Decision

IHO Kenneth Peters was appointed to hear the case. (P's 56.1 Stmt. ¶¶ 22-23.)  He held pre-hearing conferences on December 19, 2019; January 31, 2020; February 27, 2020; April 27, 2020; and May 22, 2020. (*Id.* ¶ 24.)  At the hearing on December 19, 2019, Plaintiff's counsel requested an interim order for the IEEs, because although the District seemed to have granted the request in October 2019, the IEEs had not yet been completed. (Pre-Hearing Tr. at 18:9-24.) The District's counsel noted that "because the parent is requesting IEEs from a specific provider who is not currently contracted with the district, the district would have to set up a contract.  That would have to go to the district's Board of Ed[ucation]. . . .  because the parent wants someone we are not familiar with.  And we presume that the person the parent chose or the individuals that the parent chose is appropriately qualified and meets all the certification requirements, et cetera." (*Id.* at 20:11-19.)  The District indicated that the Board could review Plaintiff's request

in its January 2020 meetings.  (*Id.* at 21:12-22:13.)  At the January 31, 2020 conference, the

District stated it would allow the IEEs to be conducted by the Parent's chosen evaluators at their

quoted rates.  (*Id.* at 52:2-12; *see* P's 56.1 Stmt. ¶ 25.)  All IEEs were completed by May 19,

2020, (*see* D's Exs. 21-25), except for the FBA, which could not be completed in light of the

COVID-19 pandemic, (D's 56.1 Resp. ¶ 26; P's 56.1 Stmt. ¶ 27).

On June 30, 2020, the IHO commenced a virtual hearing that concluded on December 11,

2020 after seven non-consecutive days of testimony.  (P's 56.1 Stmt. ¶¶ 28-32; D's 56.1 Stmt. ¶¶

169-170.)  The District called twelve witnesses, the Parent called six witnesses, and a total of 71

exhibits were entered into evidence.  (P's 56.1 Stmt. ¶¶ 28-32, 78, 80, 155.)  Plaintiff notes that

none of the District's witnesses were presented as expert witnesses or qualified as such by the

IHO, (*id.* ¶ 33), but the District notes that its witnesses – all of whom were fact witnesses who

worked with I.J.B. – were highly credentialed, (D's 56.1 Resp. ¶ 33).

During the hearing, Plaintiff attempted to seek prospective tuition reimbursement for

I.J.B.'s placement at Shrub Oak, to which the District objected.  (D's 56.1 Stmt. ¶ 171.)  Plaintiff

highlights several instances during the hearing when the IHO Peters seemed confused or

inattentive.  (P's 56.1 Stmt. ¶¶ 135-153.)

On February 24, 2021, the IHO issued a one-page decision in favor of the District.  (D's

56.1 Stmt. ¶ 174; P's 56.1 Stmt. ¶ 156; Decision of IHO Kenneth Peters, dated Feb. 24, 2021

("IHO Decision").)  He stated,

> The record confirms that the student was placed in an academic environment which
> allowed him to progress with peers in a communication/socialization based focus.

> A review of the student's progress during the years, 2017 to 2020 at the Kaplan school,
> reported progress in most goals as outlined.  The design of the program as "push in"
> encouraged specialty sharing and generalization with school and ancillary personnel.

The student IEPs were completed in a timely manner and reviewed at scheduled committee meetings.  The IEE was also reviewed in a timely manner as outlined by NYS procedural standards.

(IHO Decision.)  He found:

1.  FAPE in [Least Restrictive Environment] was provided [to] student I.J.B.
2.  Since the Kaplan School has credentialed professionals an FBA should be conducted to determine whether a BIP is to be recommended.
3.  As assistive technology device is to be available for the student while in school and at home.
4.  Parent training and counseling coordinated by the school district is highly recommended.

(*Id.*)

### 3.    State Review Officer Decision

Plaintiff appealed the IHO's decision to the New York State Education Department's State Review Office.  (D's 56.1 Stmt. ¶ 175.)  The Parent raised three grounds:  (1) the IHO failed to perform his duty because he seemed to not understand the status of the case, evidence, or arguments, and at times seemed to not be paying attention to or engaging in the hearing; (2) the IHO erred by finding that the District offered the student a FAPE for the school years in question; and (3) the District inappropriately shifted the burden to the Parent during the hearing, which prejudiced the IHO against the Parent.  (Request for Review, IHO Case No. 533232 ("P's Appeal") ¶¶ 11, 25, 35.)  The SRO denied Plaintiff's appeal in a 33-page, single-spaced decision. (D's 56.1 Stmt. ¶ 176.)  The SRO did not take testimony but reviewed the hearing transcripts, the exhibits, the parties' post-hearing briefs and the appellate pleadings.  (P's 56.1 Stmt. ¶¶ 174-176; D's 56.1 Resp. ¶¶ 174, 176.)

Addressing the Parent's first ground for review, the SRO agreed that "there appeared to be several instances during the course of the impartial hearing when the IHO was distracted or expressing discomfort," but that "the hearing record does not support a finding that the parent

was denied a right to present her case or that the hearing record was incomplete."  (SRO

Decision at 17.)  The SRO also acknowledged that "the IHO's written decision contains only one

page of findings, and thus . . . the written decision itself is unduly brief [and] unreasonably

lacking in citation to specific evidence in the hearing record to support the conclusions reached

by the IHO," and accordingly found it "worthy of little deference.  (*Id.*)  The SRO therefore

"conducted an impartial and independent review of the entire hearing record to resolve the

particular issues that the parties have advanced on appeal."  (*Id.*)

As to the Parent's argument that the District shifted the burden of proof, the SRO found

this argument to be without merit because "[t]here is no indication in the hearing record that the

IHO did not properly apply the burden of proof to the district and the parent does not assert that

the IHO shifted the burden of proof."  (*Id.* at 18.)

As to the denial of a FAPE, the SRO found that the record showed that the CSE offered

I.J.B. similar programming in his IEPs from year to year, that he achieved the majority of his

goals each year, and that the trend showed that his progress would likely continue.  (*Id.* at 29.)

The SRO also agreed with the IHO that "the CSEs' recommendation for the 8:1+2 special class .

. . was appropriate and was reasonably calculated to enable the student to receive education

benefits in light of his circumstances."  (*Id.*)  As to the Parent's arguments about AT, the SRO

found that the record supported a finding that the CSE's recommendation that I.J.B. have access

to an augmentative communication device was appropriate, (*id.* at 31), and while the Parent took

issue with the particular application that was used by the student, "there is no authority that a

specific application must be specified on a student's IEP" in order to provide a FAPE, and that

"the district's utilization of one application over another during the years in question was [not]

inconsistent with the IEP mandates or inappropriate," (*id.* at 31-32).  Lastly, the SRO found that

"while the student's use of the device in the home was somewhat problematic due to the student's deleting of applications," the record did not support finding that the District meaningfully deviated from the IEP.  (*Id.* at 33.)

The SRO ultimately concluded that while "[t]he IHO's written decision . . . failed to reference the factual underpinnings of his conclusions regarding the parties' disputes with reference to the hearing record, and it failed to comport with standard legal practice," correction of those flaws "would not lead to a different outcome.  The hearing record demonstrates that the district offered the student a FAPE for the 2017-18, 2018-19 and 2019-20 school years."  (*Id.*)

### 4.    The Instant Action

Plaintiff filed the Complaint on August 20, 2021, seeking an order reversing the SRO's decision, remanding the proceeding to an impartial hearing officer, and finding that (1) the District failed to provide I.J.B. with a FAPE for the 2017-2018, 2018-2019, and 2019-2020 school years, (2) the District is therefore required to fund a variety of compensatory education services, and (3) the District must fund an FBA and BIP by a provider of Plaintiff's choosing. (Compl. at 26-28.)  Plaintiff did not seek prospective tuition reimbursement for Shrub Oak.

## II.   LEGAL STANDARDS

### A.  Summary Judgment Standard for IDEA

Motions for summary judgment customarily resolve IDEA actions in federal court.  *See Antonaccio ex rel. Alex v. Bd. of Educ.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).  Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion.  *Id.*  Rather, summary judgment "is a pragmatic procedural mechanism for reviewing administrative decisions."  *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247,

252 (2d Cir. 2009).[12]  In reviewing an action pursuant to 20 U.S.C. § 1415(i), the district court

"(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence

at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall

grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); *see P.C. v.*

*Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 406 (S.D.N.Y. 2017).

The court's review "requires a more critical appraisal of the agency determination than

clear-error review but falls well short of complete *de novo* review." *L.O. ex rel. K.T. v. N.Y.C.*

*Dep't of Educ.*, 822 F.3d 95, 108 (2d Cir. 2016).  The district court must engage in an

independent review of the administrative record and make a determination based on a

preponderance of the evidence, but its review of state administrative decisions is limited.  *See*

*Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982); *M.H. ex rel. P.H. v. N.Y.C. Dep't of Educ.*,

685 F.3d 217, 240 (2d Cir. 2012); *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129

(2d Cir. 1998).  "While federal courts do not simply rubber stamp administrative decisions, they

are expected to give due weight to these proceedings, mindful that the judiciary generally lacks

the specialized knowledge and experience necessary to resolve persistent and difficult questions

of educational policy." *Walczak*, 142 F.3d at 129; *see M.H.*, 685 F.3d at 240.

In many instances, "the district court's analysis will hinge on the kinds of considerations

that normally determine whether any particular judgment is persuasive, for example whether the

decision being reviewed is well-reasoned, and whether it was based on substantially greater

familiarity with the evidence and the witnesses than the reviewing court," but the determination

"must also be colored by an acute awareness of institutional competence and role." *M.H.*, 685

---

[12] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

F.3d at 244.  Deference to administrative decisions is particularly warranted where the district

court's review "is based entirely on the same evidence as that before the SRO," *id.*, and where

the IHO and SRO decisions are in agreement, *C.W. ex rel. W.W. v. City Sch. Dist. of the City of

N.Y.*, 171 F. Supp. 3d 126, 131-32 (S.D.N.Y. 2016).  Where the IHO and SRO decisions conflict,

the IHO's "may be afforded diminished weight," as the Court "defer[s] to the final decision of

the state authorities" – that is, the SRO's decision.  *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d

165, 171 (2d Cir. 2009).  Reviewing courts should also be mindful that they are not to "substitute

their own notions of sound educational policy for those of the school authorities which they

review." *Rowley*, 458 U.S. at 206.  Accordingly, "a court must defer to the SRO's decision on

matters requiring educational expertise unless it concludes that the decision was inadequately

reasoned," *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012), particularly with

respect to "determinations regarding the substantive adequacy of an IEP," *M.H.*, 685 F.3d at 244.

In short, deference to "the application of expertise and the exercise of judgment by school

authorities" is appropriate where they "offer a cogent and responsive explanation for their

decisions." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001-

02 (2017).

### B.  Provision of a FAPE

"The IDEA requires States receiving federal funds to provide 'all children with

disabilities' with a FAPE," which includes "'special education and related services' tailored to

meet the unique needs of a particular child." *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735,

741 (2d Cir.) (first quoting 20 U.S.C. § 1412(a)(1)(A); then quoting *id.* § 1401(9)).  Related

services include "transportation, and such developmental, corrective, and other supportive

services . . . as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A).

"The IEP is 'the centerpiece of the [IDEA's] education delivery system for disabled children.'" *Mr. P*, 885 F.3d at 741 (quoting *Endrew F.*, 137 S. Ct. at 994).  The IEP must be developed annually by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child." *Walczak*, 142 F.3d at 122.  "A school district meets its obligations to provide a FAPE by creating an IEP that is developed in compliance with the IDEA's procedural and substantive requirements." *N.B. v. N.Y.C. Dep't of Educ.*, 711 F. App'x 29, 32 (2d Cir. 2017) (summary order).  In the Second Circuit, review of the adequacy of an IEP proceeds in two steps:  (1) whether "the District has complied with the IDEA's procedural requirements" and (2) whether, substantively, the IEP is "'reasonably calculated to enable the child to make progress appropriate in light of the child's circumstances.'"  *Mr. P*, 885 F.3d at 748 (quoting *Endrew F.*, 137 S. Ct. at 1001).  "As to this latter requirement, the IEP need not bring the child to grade-level achievement, but it must aspire to provide more than *de minimis* educational progress." *N.B.*, 711 F. App'x at 32.  But "[w]hat the statute guarantees is an appropriate education, not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132.

"In addition to providing an education that is likely to produce progress and tailored to the unique needs of the child, the program must be offered in the least restrictive environment." *Avaras ex rel. A.A. v. Clarkstown Cent. Sch. Dist.*, No. 18-CV-6964, 2019 WL 4600870, at *2 (S.D.N.Y. Sept. 21, 2019) (citing 20 U.S.C. § 1412(a)(5)(A)).  "[A] disabled student's least restrictive environment refers to the least restrictive educational setting consistent with that student's needs, not the least restrictive setting that the school district chooses to make

available." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 163 (2d Cir. 2014).

"This requirement expresses a strong preference for children with disabilities to be educated, to

the maximum extent appropriate, together with their non-disabled peers." *Id.* at 161.

> "New York's regulations implementing the goals of the IDEA 'appear to track the IDEA

closely.'" *P.C.*, 232 F. Supp. 3d at 408 (quoting *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d

Cir. 2006)); *see* N.Y. Educ. Law §§ 4401 to 4410-b. Parents are entitled to challenge "any

matter relating to the identification, evaluation or educational placement of the student or the

provision of a free appropriate public education to the student." N.Y. Educ. Law § 4404(1); *see*

*also* 20 U.S.C. § 1415(b)(6)(A) (same). Such challenges must be heard at an impartial due

process hearing conducted by the state or local education agency, *see* 20 U.S.C. § 1415(f), and

either party may appeal an adverse decision to the appropriate state agency, *see id.* § 1415(g);

N.Y. Educ. Law § 4404(2). Once this administrative process is exhausted, a party may file a

civil action in federal or state court challenging the administrative decision. *See* 20 U.S.C.

§ 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

> "[C]ompensatory education is an available option under the [IDEA] to make up for denial

of a free and appropriate public education." *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*,

546 F.3d 111, 123 (2d Cir. 2008). "Compensatory education is prospective equitable relief,

requiring a school district to fund education beyond the expiration of a child's eligibility as a

remedy for any earlier deprivations in the child's education." *Somoza v. N.Y.C. Dep't of Educ.*,

538 F.3d 106, 109 n.2 (2d Cir.2008). Because it "aims to make up for educational services the

child should have received in the first place," *Doe v. E. Lyme Bd. of Educ.*, 962 F.3d 649, 659

(2d Cir. 2020), compensatory education "must be reasonably calculated to provide the

educational benefits that likely would have accrued from special education services the school

district should have supplied," *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 457 (2d Cir. 2015).

### C.  **Evaluations**

Under the IDEA, the child "must receive a full and individual initial evaluation to

determine the existence and extent of their disability and whether they are entitled to special

education and related services" and is "entitled to a reevaluation at least once every three years

for the purpose of updating their IEP.  Because it occurs by default every three years, this is

generally referred to as a triennial reevaluation."  *D.S. ex rel. M.S. v. Trumbull Bd. of Educ.*, 975

F.3d 152, 157 (2d Cir. 2020) (citing 20 U.S.C. § 1414(a)(1)-(2), (d)(4)(a)).  Triennial

reevaluations must be comprehensive.  When conducting these evaluations, schools must "use a

variety of assessment tools and strategies to gather relevant functional, developmental, and

academic information," 20 U.S.C. § 1414(b)(2)(A), and must assess the child in "all areas of

suspected disability," *id.* § 1414(b)(3)(B).  The school must "ensure that . . . the IEP Team . . .

reviews the child's IEP periodically, but not less frequently than annually, to determine whether

the annual goals for the child are being achieved."  *Id.* § 1414(d)(4)(A)(i); *see D.S.*, 975 F.3d at

157 ("The child's IEP Team takes the results of these evaluations and regularly collaborates to

develop, maintain, and update the child's IEP over the course of their education.").

Additionally, "[t]he parents of a child with a disability have the right . . . to obtain an

[IEE] of the child," 34 C.F.R. § 300.502(a)(1), and the school must consider the results of such

evaluations "in any decision made with respect to the provision of FAPE to the child," *id.* §

300.502(c)(1).  An IEE is "an evaluation conducted by a qualified examiner who is not employed

by the public agency responsible for the education of the child in question."  *Id.* §

300.502(a)(3)(i).  The right to obtain an IEE "is practically constrained by the parent's ability or

desire to pay for an IEE," *D.S.*, 975 F.3d at 158, but the "parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency."  34 C.F.R. § 300.502(b)(1).  "[T]he public agency must, without unnecessary delay, either . . . [f]ile a due process complaint to request a hearing to show that its evaluation is appropriate," or "[e]nsure that an [IEE] is provided at public expense."  *Id*. § 300.502(b)(2)(i)-(ii).  The IEE process provides "parents access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion," and it ensures that parents "are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition."  *Schaffer ex rel Schaffer v. Weast*, 546 U.S. 49, 60-61 (2005).

III.  **DISCUSSION**

Plaintiff argues that the SRO (1) erred in determining that the failure to implement necessary and individualized AT was a minor failure to implement the IEP, (2) disregarded Second Circuit precedent when it determined that the District's failure to conduct an FBA was not a denial of a FAPE, and (3) denied the Parent the right to due process when it made factual determinations without considering material witness testimony despite the IHO's overwhelming failure to conduct an impartial hearing.  (*See* ECF No. 25 ("P's Mem") at 1.)  Specifically, Plaintiff contends that the District's failure to conduct an AT evaluation prior to providing AT, and its failure to conduct an FBA, constitute procedural and substantive failures, (*id.* at 7-13), and that the SRO failed to conduct an in-depth and complete review of the record, especially as to Plaintiff's experts, (*id.* at 21-25).  Defendant argues that the SRO correctly found that the relevant IEPs and AT provided I.J.B. a FAPE and that he did not require an FBA, and that

deference to the SRO requires dismissal of Plaintiff's claim for compensatory education.  (*See* ECF No. 19 ("D's Mem.") at 3-24.)

      **A.**      **The SRO's Review of the Record**

      Plaintiff alleges the SRO committed two major errors in evaluating the record and arriving at its conclusions:  the SRO (1) "was silent on the Parent's experts all together," (ECF No. 23 ("P's Reply") at 5), and in particular did not discuss Dr. Piegari, (P's Mem. at 19-20, 24), and (2) "disregarded the inherent difference" between fact witnesses and expert testimony, (*id*. at 20).

      But the SRO did discuss Plaintiff's experts.  The SRO refers to Kornblum's testimony when discussing whether an FBA should have been conducted, (*see* SRO Decision at 27), and Morrow's evaluation in relation to his AT needs, (*see id.* at 31-33).  The only expert not cited or mentioned was Dr. Piegari, the independent evaluator who conducted I.J.B.'s neuropsychological IEE.  While some courts have found that the failure to discuss witnesses may warrant not granting deference to the SRO, *see C.L. v. N.Y.C. Dep't of Educ.*, No. 12-CV-1676, 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013) ("[T]he critical fact remains that the SRO did not grapple with contrary evidence and gave no explanation for why it credited the unfounded assertions of a school psychologist who had observed [the child] for only an hour and a quarter over the cogent testimony of multiple highly credentialed teachers who had worked closely with [the child] for a full school year.  The SRO's Decision on this issue cannot be described as well-reasoned or based on substantially greater familiarity with the evidence and the witnesses than the reviewing court, and therefore merits no deference."), *aff'd*, 552 F. App'x 81 (2d Cir. 2014); *M.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125, 161 (S.D.N.Y. 2010) ("The SRO's decision on this point does not warrant deference because the SRO improperly excluded Plaintiffs'

substantial methodology evidence, which tended to show that [the child] required a methodology employing a 1:1 student-teacher ratio."), in those cases, the SROs failed to discuss any contrary testimony, which the SRO did not do here.  (*See* SRO Decision at 27, 31.)  The SRO discussed the different views of the witnesses when necessary, (*see id.*), and made clear that its conclusions were based on review of the entire record, (*see id*. at 2, 17, 33).

Contrary to Plaintiff's argument, (P's Mem. at 23-24), the SRO did not determine the credibility of any witness, fact or expert; it simply recounted the evidence on which it relied on in totality.  There is no requirement that an SRO give more weight to expert testimony than to that of fact witnesses, *see C.S. v. Yorktown Cent. Sch. Dist*., No. 16-CV-9950, 2018 WL 1627262, at *23-24 (S.D.N.Y. Mar. 30, 2018) ("[T]he SRO was not required to accept Dr. Dorta's testimony merely because he was an 'expert'" and "[a]bsent any further explanation from Plaintiff about how Dr. Dorta's testimony undermined the other evidence cited by the SRO, or any caselaw suggesting that his expert status alone should be given more weight, the Court agrees with the SRO's well-reasoned decision."), and that the SRO ultimately found the fact witnesses more persuasive does not suggest that the experts were not considered, *see McCallion v. Mamaroneck Union Free Sch. Dist*., No. 10-CV-6207, 2013 WL 237846, at *10 (S.D.N.Y. Jan. 22, 2013) (SRO did not err "by relying too heavily on the evaluations and opinions of the District's witnesses while giving little or no weight to the conclusions of Parent's experts"); *cf. B.M. v. Pleasantville Union Free Sch. Dist.*, No. 20-CV-2192, 2021 WL 4392281, at *13 (S.D.N.Y. Sept. 24, 2021) ("Consideration, moreover, does not require that there be substantive discussion, that every member of the CSE read the document, or that the CSE accord the private evaluation any particular weight.") (collecting cases); *MN ex rel. EN v. Katonah Lewisboro Sch. Dist*., No. 19-CV-6793, 2020 WL 7496435, at *17 (S.D.N.Y. Dec. 21, 2020) ("The mere fact

that a separately hired expert has recommended different programming does nothing to change the deference owed to the district and its trained educators.") (collecting cases); *see also Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 387 (2d Cir. 2014) ("That we or the district court may otherwise be willing to draw conclusions from pieces of evidence that the SRO did not believe were appropriate is not enough to demonstrate insufficient reasoning on the part of the SRO. It is precisely because we recognize that state educational authorities possess greater expertise in drawing conclusions from educational proceedings that it is clearly established in this Circuit that deference to administrative proceedings is particularly warranted where, as here, the district court's decision was based solely on the administrative record."). "[E]ven if the SRO gave greater weight to the District's experts, a court cannot choose between the competing views of experts on matters of educational policy or substitute its own judgment for that of the hearing officers which it reviews." *G.W. v. Rye City Sch. Dist.*, No. 11-CV-8208, 2013 WL 1286154, at *24 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 554 F. App'x 56 (2d Cir. 2014). The fact "[t]hat privately hired experts recommended different teaching methodologies for [I.J.B.] does not undermine the deference the Court must pay to the District. . . . [I]t is inappropriate to choose between views of conflicting experts on a controversial issue of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence." *Watson v. Kingston City Sch. Dist.*, 142 F. App'x 9, 10 (2d Cir. 2005).

Nor does the SRO's failure to discuss Dr. Piegari require me to withhold deference. First, the SRO made clear that the entire hearing record had been considered. (SRO Decision at 17.) Second, Piegari's testimony and evaluation would not change the ultimate conclusions reached by the SRO. As Defendant points out, Piegari performed cognitive testing but did not

offer any information on I.J.B.'s abilities that materially differed from what was already known, (D's Mem. at 7-8; *see generally* D's Ex. 25), and during his evaluation, he did not observe I.J.B. in a school setting or receive feedback from Kaplan staff in arriving at his conclusions, (Tr. at 1004:9-13, 1005:7-16, 1014:10-14; *see generally* D's Ex. 25). *See J.F. ex rel. N.F. v. N.Y.C. Dep't of Educ.*, No. 14-CV-3724, 2015 WL 892284, at *5 (S.D.N.Y. Mar. 3, 2015) ("[A]lthough plaintiffs challenge the evidentiary basis for the SRO decision, they do not point to any specific items of evidence that were overlooked by the SRO and that would have had a material effect on the SRO's decision . . . ."). Finally, the only testimony of Piegari that Plaintiff specifies as potentially relevant was (1) his opinion that an FBA is required if "emotional or behavioral responses in any way interfere with learning," (P's Mem. at 19-20), which, as discussed below, misstates the requirements of the IDEA, and (2) his observation that there were no recommendations for parent training on the AT device, (*see id.* at 12-13), which, as also discussed below, is not required under the statute. In short, that the SRO "did not explicitly address every witness's testimony does not undermine the Court's conclusion that [the SRO's] decision was generally well-reasoned and persuasive," *J.S. v. N.Y.C. Dep't of Educ.*, 104 F. Supp. 3d 392, 402 (S.D.N.Y. 2015), *aff'd*, 648 F. App'x 96 (2d Cir. 2016).

To the extent Plaintiff believes the SRO improperly deferred to the IHO's decision, (P's Mem. at 23-24), this argument is without merit. The SRO acknowledged the various failures of the IHO, and undertook an independent review of the record, (*see* SRO Decision at 15-18), resulting in a thorough, careful, reasoned and persuasive 33-page decision. That the SRO ultimately reached the same conclusion as the IHO does not render the findings problematic. *See M.W. ex rel. S.W. v. N.Y.C. Dept. of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013) ("Where an SRO has clearly demonstrated a better command of the record and supported [his] conclusions

through better legal and factual analysis than an IHO, we will have little difficulty deferring to the SRO's opinion."); *see also T.C. ex rel. A.C. v. N.Y.C. Dep't of Educ.*, No. 15-CV-3477, 2016 WL 1261137, at *8 (S.D.N.Y. Mar. 30, 2016) (although IHO's decision relied on "incorrect interpretation of the law and the record," SRO's decision nonetheless entitled to deference because it "was well-reasoned and supported by the record"); *P.G. ex rel. D.G. v. City Sch. Dist.*, No. 14-CV-1207, 2015 WL 787008, at *15 (S.D.N.Y. Feb. 25, 2015) (IHO decision did not warrant deference "especially when compared to the analytically intensive opinion rendered by the SRO," and therefore "while the Court . . . undert[ook] its own detailed review of the record, it appropriately accord[ed] deference to the sound opinion of the SRO"). Based on the evidence in the administrative record – all of which was also presented to the SRO, *see M.H.*, 685 F.3d at 244 ("[T]he district court should afford more deference [to the SRO's decision] when its review is based entirely on the same evidence as that before the SRO . . . ."); *P.C.*, 232 F. Supp. 3d at 410 (well-reasoned, detailed SRO opinion entitled to deference) – I conclude that the SRO's decision deserves deference from this Court. The preponderance of the evidence, *see* 20 U.S.C. § 1415(i)(2)(C)(iii), supports the SRO's conclusions, for the reasons discussed below.

### B.     The SRO's Determinations as to AT

Plaintiff argues that the SRO erred in determining that (1) the failure of I.J.B. to bring his device home – leaving him "without [his] voice when leaving the school building" – was not a significant deviation from the IEP, (P's Mem. at 9-10), (2) the District did not deny a FAPE by providing an "inappropriate device despite evidence of device abandonment," (*id.* at 12-13), and (3) the lack of parental AT training was a minor error, (*id.*). Defendant argues that whether I.J.B should have had his device at home is a matter of educational policy and that the SRO's determination was supported by the record. (D's Mem. at 9-10.) The Court agrees.

First, Plaintiff summarily argues that the failure to allow I.J.B. to bring his device home was not insignificant, but does not cite to any evidence showing that keeping the device at school deprived I.J.B. of an educational benefit.  The SRO's finding that the lack of a home AT option was *de minimis* is supported by the record.  Specifically, I.J.B.'s IEPs and assessment of goals demonstrate that despite not having access to a device at home consistently, he still progressed. During the 2017-2018 school year, and for a portion of the 2018-2019 school year, I.J.B. used an iPad with the Proloquo2Go software and the CSE had recommended that his device be used at home.  (D's Ex. 4 at 8, 13; D's Ex. 10 at 8, 12.)  Having it at home, however, presented a problem because when I.J.B. had had the iPad at home in the past, he would delete applications and not bring the iPad back to school with him.  (Tr. at 343:19-344:2, 654:24-655:21.)  Plaintiff does not suggest what the District could have done to prevent these issues, and keeping the device at school – where it would be available for learning – was plainly a reasonable solution designed to maximize the educational benefit to I.J.B.

Although Rosenthal testified that Plaintiff did not like the Proloquo2Go application, he was able to use it proficiently.  (*See id*. at 761:14-17; D's Ex. 4 at 8.)  In December 2018, Temple conducted I.J.B.'s AT evaluation and recommended he switch from the Proloquo2Go application to LAMP, because while using LAMP, he "was able to formulate grammatically correct sentence[s] and combine icons to make longer sentences.  He really had no trouble at all with this . . . .  [She] felt it was the better one for him to use."  (Tr. at 650:2-20; D's Ex. 13 at 4.) Temple testified that I.J.B. was provided with an iPad with the LAMP application, (Tr. at 651:11-15), and Klayman testified that I.J.B. used the application independently and was "very good at it," (*id.* at 553:4-25, 558:16-18).  By April 2018, five months after the AT evaluation and switch to LAMP, I.J.B. was able to spell familiar words; formulate longer responses with

alternate means of communication; and, with the help of his device, request, comment, and respond to questions.  (D's Ex. 17 at 1-2, 10.)  During this school year, he also achieved two of the three speech goals, and achieved all other IEP goals, except for goal 14, which was a motor skill goal relating to his posture control.  (D's Ex. 37 at 7-8, 12-13; *see generally id*.)[13]

During the 2019-2020 school year, he achieved nine out of his thirteen goals, (D's Ex. 38 at 1-15), including all of his speech and language goals, (*id*. at 6-8).  During the 2019-2020 school year, which was interrupted by the pandemic, I.J.B. continued to achieve his IEP speech and language goals and had reached most of his benchmarks/objectives by the time the pandemic hit.  (D's Ex. 39 at 1-14.)[14]  Therefore, despite not having access to the device at home every year, I.J.B. still progressed as expected and outlined in his IEPs, thus supporting the SRO's finding that this failure to provide AT while at home was a *de minimis* departure from the IEPs. While having devices in both places would have ideal, I.J.B. was plainly able to make progress appropriate to his circumstances despite having the iPad only at school.  There was thus "not such a material deviation from the student's IEP that [he] was denied a FAPE."  *Y.F. v. New York City Dep't of Educ.*, No. 15-CV-6322, 2015 WL 4622500, at *6 (S.D.N.Y. July 31, 2015), *aff'd*, 659 F. App'x 3 (2d Cir. 2016); *see A.P. v. Woodstock Bd. of Educ.*, 370 F. App'x 202, 205 (2d Cir. 2010) (deviation from IEP was not material failure); *A.L. v. N. Y. C. Dep't of Educ.*, 812 F. Supp. 2d 492, 503 (S.D.N.Y. 2011) ("[E]ven where a district fails to adhere strictly to an IEP,

---

[13] Plaintiffs argue that Defendant misconstrues I.J.B.'s 2017-2018 progress report, stating goals 6 and 8 were not evaluated at all marking periods.  (P's Reply at 7.)  But both goals 6 and 8 specify that they would be achieved "[b]y February," which I.J.B. did, so thereafter there was no need to address them.  (D's Ex. 37 at 7-8.)

[14] Prior to COVID-19, I.J.B. did not have the iPad at home, but as of the impartial hearings, he did.  (Tr. at 694:22-25.)

courts must consider whether the deviations constitute a material failure to implement the IEP and therefore deny the student a FAPE.").

Second, the SRO's finding that the District did not fail to provide I.J.B. a FAPE by using the LAMP application instead of another, such as the one recommended by independent evaluator Morrow, was sound.  "[T]he IDEA does not require a school district to provide a specific program or employ a specific methodology in providing for the education of children with disabilities." *H.C. v. Katonah-Lewisboro Union Free Sch. Dist.*, No. 09-CV-10563, 2012 WL 2708394, at *16 (S.D.N.Y. May 24, 2012), *aff'd sub nom*. *H.C. ex rel. M.C. v. Katonah–Lewisboro Union Free Sch. Dist.*, 528 F. App'x 64 (2d Cir. 2013); *see A.H. ex rel. J.H. v. Dep't of Educ. of N.Y.C.*, 394 F. App'x 718, 721 (2d Cir. 2010) ("IDEA does not require that an IEP furnish every special service necessary to maximize each handicapped child's potential.").[15] "[A] school district does not fail to provide a child with a FAPE simply because it employs one assistive technology over another, so long as the technology employed is reasonably calculated to permit the child to receive educational benefits." *H.C.*, 528 F. App'x at 67.

That the District believed that LAMP was better for I.J.B. than the program recommended by Morrow does not mean it failed to provide a child with a FAPE, "so long as the device employed is reasonably calculated to allow the child to receive educational benefits." *H.C.*, 2012 WL 2708394, at *16; *see, e.g.*, *Sherman v. Mamaroneck Union Free Sch. Dist.*, 340 F.3d 87, 93-94 (2d Cir.2003) (school district entitled to provide AT it deems reasonably calculated to enable child to receive educational benefit, not necessarily the technology requested).  Plaintiff provides no evidence to suggest that LAMP did not function or was

---

[15] Nor does Plaintiff provide authority suggesting that the CSE must specify in the IEP the specific applications to be used in an assistive device.

otherwise inadequate, but simply points to testimony that I.J.B. preferred another application, which is not enough, especially given that I.J.B. used LAMP independently and was "very good at it." (Tr. at 558:18; *see id*. at 553:4-555:3, 558:16-18, 871:14-21.) Even Morrow, Plaintiff's expert, acknowledged that I.J.B. "did well" with LAMP. (*Id*. at 1075:16-17.) *See A.S. v. Trumbull Bd. of Educ.*, 414 F. Supp. 2d 152, 177 (D. Conn. 2006) (noting plaintiffs' failure to point to record evidence that students could not make progress required by IDEA without particular assistive technology they sought).

Given that the record supports the view that I.J.B. progressed and achieved his IEP goals while using LAMP, it is clear that LAMP conferred an educational benefit on I.J.B., and therefore the SRO did not err in finding that the District provided I.J.B. with a FAPE as to his AT needs. That Temple and Morrow disagreed as to which application would be better does not suggest that the Court should not defer to the SRO's conclusion that Morrow's preferred application was not necessary to provide I.J.B. with a FAPE. Indeed, that sort of educational decision is precisely the kind that courts are ill equipped to make. *See F. v. City Sch. Dist. of the City of N.Y.*, No. 15-CV-1448, 2016 WL 1274579, at *11 (S.D.N.Y. Mar. 31, 2016) ("A court cannot choose, however, between the competing views of experts on matters of educational policy or substitute its own judgment for that of the hearing officers which it reviews" because "[c]ourts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.").

To the extent Plaintiff argues that the SRO did not sufficiently consider Morrow's testimony and discussion of device abandonment, this contention is belied by the record. The SRO clearly took Morrow's testimony under consideration, (*see* SRO Decision at 31 ("The parent points to this testimony as evidence of 'device abandonment,' which one of her expert

witnesses described as occurring when a device is not the right fit or the use doesn't have the right training, 'so they just give up.'")), but found, citing the hearing transcript and multiple exhibits, that the record "demonstrates that the student used the iPad and the applications thereon with success," (*id.*).  There is no evidence in the record that I.J.B. himself experienced "device abandonment," as he continued to use the application and progress in his goals over the relevant years.  (*See* Tr. at 553:17-555:3, 870:3-19, 1075:16-18; D's Ex. 4 at 8; D's Ex. 10 at 8; D's Ex. 17 at 9-10.)  The Court thus has no reason to disturb the SRO's weighing of Morrow's testimony and the District evidence regarding AT.

Finally, Plaintiff's contention that the failure to provide parent training on AT was a non-minor error is also unavailing.  The SRO correctly noted that the Second Circuit has held that "[t]hough the failure to include parent counseling in the IEP may, in some cases (particularly when aggregated with other violations), result in a denial of a FAPE, in the ordinary case that failure, standing alone, is not sufficient to warrant [a finding that a FAPE has been denied]," *R.E.*, 694 F.3d at 191; *see E.F. v. N.Y.C Dep't of Educ.*, No. 12-CV-2217, 2013 WL 4495676, at *22 (E.D.N.Y. Aug. 19, 2013) (collecting cases), and that here, the District's failure to include AT training for the parents as part of I.J.B.'s IEPs did not rise to the level of a denial of a FAPE.  As the SRO noted, while I.J.B.'s IEPs did not include recommendations for AT training specifically, the 2018-2019 and 2019-2020 IEPs called for parent training generally, and the parents were repeatedly offered training and counseling by Kaplan, which could have included AT training, but they never tried to take Kaplan up on the offer, even after learning went remote.  (SRO Decision at 32; *see* D's Ex. 10 at 1; D's Ex. 17 at 1; Tr. at 319:18-320:15.)  In light of the SRO's proper application of the governing standard, I have no basis to disturb the SRO's

conclusion that the effect of the lack of parental training in the IEP was minimal – an educational evaluation on which the court lacks the expertise to opine.

For all these reasons, I defer to the SRO's finding that the District's handling of I.J.B.'s AT needs did not deprive him of a FAPE.

**C.      The SRO's Determinations as to the FBA**

Plaintiff argues that the District's failure to more expeditiously provide an FBA constitutes a procedural and substantive violation, which the SRO disregarded in finding the District did not deny I.J.B. a FAPE.  (P's Mem. at 20-21.)  Further, Plaintiff takes issue with the SRO's consideration of their experts in arriving at that conclusion.  (*Id.* at 17-25.)

Defendant notes that it has already granted Plaintiff's request to conduct an FBA but that it was not scheduled due to the COVID-19 pandemic, (D's Mem. at 16-17), because an FBA must be conducted at the student's school.  *See* N.Y. Comp. Codes R. & Regs. tit. 8, 200.1(r) ("*Functional behavioral assessment* means the process of determining why the student engages in behaviors that impede learning and how the student's behavior relates to the environment. The functional behavioral assessment . . . shall include, but is not limited to, the identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior (including cognitive and affective factors) and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it.") (emphasis in original).  In the decision, the SRO noted:

> There is no indication in the hearing record that the parent has attempted to obtain the FBA and BIP since the conclusion of the impartial hearing, that she is unable to do so, or that the district is refusing to pay.  Rather, the district continues to acknowledge that it has agreed to fund the independent FBA and BIP.  As the parties appear to be in agreement regarding the IEE, it is unnecessary to address the parent's request for an independent FBA and BIP.

(SRO Decision at 11 n.17.)  The SRO nevertheless later determined that I.J.B.'s behaviors were

handled in the classroom, and that there was "no evidence of a persistent pattern of interfering

behaviors such that the failure to conduct an FBA and develop a BIP would result [in] a denial of

a FAPE for this student."  (*Id.* at 27.)  To the extent Plaintiff is requesting that an FBA now be

conducted, that request is moot, as the District has clearly already offered to conduct one.  But to

the extent Plaintiff believes the SRO erred in determining that the District's prior failure to

conduct an FBA and implement a BIP denied I.J.B. a FAPE, I find the SRO correctly found that

it did not.

Plaintiff relies on New York regulations for the proposition that when "a student's

behavior impedes his learning," an FBA must be conducted and a BIP must be put in place.  (P's

Mem. at 14.)  The Parent also points to I.J.B.'s IEPs, where the District checked the box saying

he required "positive behavioral interventions" but did not check the box for a BIP.  (*Id.* at 14-

15; *see* D's Ex. 4 at 12; D's Ex. 10 at 11; D's Ex. 17 at 13; D's Ex. 31 at 15.)

But Plaintiff misconstrues the regulations.  New York regulations require a CSE to

consider the development of a BIP for a student with a disability when:

> (i) the student exhibits persistent behaviors that impede his or her learning or that
> of others, despite consistently implemented general school-wide or classroom-
> wide interventions;
>
> (ii) the student's behavior places the student or others at risk of harm or injury;
>
> (iii) the CSE or CPSE is considering more restrictive programs or placements as a
> result of the student's behavior; and/or
>
> (iv) as required pursuant to section 201.3 of this Title.

N.Y. Comp. Codes R. & Regs. tit. 8, § 200.22(b)(1).  Thus, under state regulations, an FBA is

required, and a BIP must be considered, when the student is exhibiting persistent behaviors that

are impeding the child's learning despite consistent interventions, which was not the case with

I.J.B.  The SRO correctly analyzed the record and determined that there was no pattern of persistent behaviors that warranted an FBA and BIP.  (SRO Decision at 26-27; *see* Tr. at 401:4-12.)  According to the record, I.J.B. was involved in an isolated behavioral incident during the 2017-2018 school year, eight such incidents during the 2018-2019 school year, and none during the 2019-2020 school year.  (Tr. at 330:4-11, 339:11-18, 352:25-353:11, 355:6-11.)  I.J.B.'s 2018-2019 IEP stated that I.J.B. had begun to show "aggressive behaviors especially if he wants something that he cannot have.  This pattern has escalated.  He gets very jealous when his friends each something before he earns it.  It has started to interfere with his progress,"[16] (D's Ex. 17 at 11), but DiMuccio testified that "it didn't actually impede his progress because he was able to make progress towards his IEP goals," (Tr. at 338:12-14; *see id.* at 337:17-339:18, 355:6-11; *see also* D's Ex. 38 at 1-15 (I.J.B. achieved nine of the thirteen goals and was progressing toward three others)).  Kaplan personnel testified that they were able to contain the behavioral incidents through interventions in the classroom.  (Tr. at 401:13-402:13, 420:19-421:6, 753:15-755:25, 860:14-867:12.)  The SRO's finding that there was "no evidence of a persistent pattern of interfering behaviors such that the failure to conduct an FBA and develop a BIP would result [in] a denial of a FAPE for this student," (SRO Decision at 27), is not only supported by the record, but is the type of educational policy determination that should be left to the SRO.

---

[16] Plaintiffs cite to I.J.B.'s April 2019 IEP to show that during the 2019-2020 school year, despite there being no reported incidents of behavioral issues, I.J.B. presented persistent behavioral problems.  (P's Reply at 7.)  But the April 2019 IEP evaluates and discusses I.J.B.'s behaviors from the 2018-2019 school year, (Tr. at 354:24-355:5), the year he had eight incidents relating to behavioral issues, (*id.* at 339:11-18).  Plaintiffs also point to I.J.B.'s June 2020 IEP, (P's Reply at 7), where the District indicated the student required positive behavior interventions, (D's Ex. 31 at 15), but this simply reflects that the pre-existing strategies that had been employed were working well and should be continued so that he could continue to succeed, (*see id.* at 12 ("Overall this year, [I.J.B.'s] problem behaviors have decreased as a result of all of [the] strategies put in place.")).

Even if I.J.B. exhibited persistent behaviors that impeded his learning, such that an FBA was required under the regulation, the District's failure to conduct one does not render the IEPs legally inadequate and constitute a denial of a FAPE.  "Though the IDEA incorporates some but not all state law concerning special education, these regulations do not raise the IDEA bar by rendering IEP's developed without an FBA legally inadequate."  *M.W.*, 725 F.3d at 140.  The IDEA only requires that, in developing an IEP for "a child whose behavior impedes the child's learning," the school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  20 U.S.C. § 1414(d)(3)(B)(i).  "Accordingly, courts have found that, if the [District] fulfilled the IDEA procedural requirements with respect to students whose behaviors impede their learning, a failure to conduct an FBA, even if the FBA was required under New York law, will not constitute a denial of a free appropriate public education."  *P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ.*, 819 F. Supp. 2d 90, 107 (E.D.N.Y. 2011); *see A.C.*, 553 F.3d at 172 (violation of state regulation regarding FBA does not compel conclusion that IEP was legally inadequate).

To determine whether the failure to perform an FBA qualifies as a denial of a FAPE, courts "take particular care to ensure that the IEP adequately addresses the child's problem behaviors."  *R.E.*, 694 F.3d at 190.  Courts in this Circuit have found a failure to conduct an FBA constitutes a violation of the IDEA where, unlike here, there was no evidence that the student's interfering behaviors were being adequately managed.  *See R.K. v. N.Y.C. Dep't of Educ.*, No. 09-CV-478, 2011 WL 1131492, at *18 (E.D.N.Y. Jan. 21, 2011) (overturning SRO decision that FBA not required because decision based on testimony that student's interfering behaviors were "not unusual," whereas "the proper inquiry in determining the necessity of an FBA is whether the behavior impedes learning, not whether the behavior is atypical"); *Danielle G. v. N.Y.C.*

*Dep't of Educ.*, No. 06-CV-2152, 2008 WL 3286579, at *10-11 (E.D.N.Y. Aug. 7, 2008) (FBA required where student's evaluator testified that student "engages in self-stimulatory activity and is hyper-active" and teacher described her as "inconsistent and erratic" and "engag[ing] in finger play during class until the point where she's bleeding").

Even assuming that I.J.B.'s conduct was impeding his learning, the record shows the District considered "the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). The District was clearly aware of I.J.B.'s behavioral issues, as evidenced by the testimony from Plaintiff's instructors, and clearly considered those issues, as evidenced by the CSE discussions that are documented in his IEPs. (D's Ex. 4 at 9-10; D's Ex. 10 at 9; D's Ex. 17 at 11; D's Ex. 31 at 12-13.) Additionally, the District's witnesses, including Rosenthal, Weisberg, and Christman, noted that I.J.B. responded positively to reward systems and constant positive reinforcement, that these interventions contained I.J.B.'s maladaptive behaviors, and that his outbursts could be successfully managed in the classroom. (Tr. at 402:6-13, 418:21-25, 753:7-755:25, 861:20-863:5, 866:4-867:12, 880:24-883:12.) The success of these efforts is demonstrated by the fact that in 2019-2020 school year, there were no reported incidents. (*Id.* at 355:6-11; *see* SRO Decision at 27 n.33). And even aside from these interventions, I.J.B.'s IEPs and progress reports clearly show that he made significant academic and social progress. (*See* D's Ex. 17 at 11; D's Ex. 31 at 12-13; D's Ex. 38 at 1-15; D's Ex. 39 at 1-14.)

Finally, the SRO plainly considered Plaintiff's expert's opinion. The SRO noted that Plaintiff's expert and the District's witnesses differed on "precisely how soon an FBA should be conducted after the student exhibited a challenging behavior." (SRO Decision at 27.) After discussing the evidence that Kaplan personnel were able to manage I.J.B. with positive behavior

intervention supports and that I.J.B.'s behaviors were not persistent or ongoing, the SRO

declined to take sides in the "pedagogical" dispute as to the proper moment for an FBA, moving

right to the conclusion that in this case the failure to conduct the FBA did not deny I.J.B. a

FAPE. (*Id.*) The Court is not equipped to evaluate that pedagogical dispute, nor – because the

SRO decision was supported by the evidence – need it do so here.

In short, the evidence supports the SRO's decision that the IEPs adequately addressed

I.J.B.'s behavior, and the sufficiency of the District's strategies for dealing with his classroom

conduct "is precisely the type of issue upon which the IDEA requires deference to the expertise

of the administrative officers." *Grim v. Rhinebeck Cent, Sch. Dist.*, 346 F.3d 377, 382 (2d Cir.

2003). Thus, I have no basis to reverse the SRO's conclusion that the failure to perform an FBA

of I.J.B. did not render his IEPs legally inadequate. *See A.C.*, 553 F.3d at 172 (evidence

supported SRO's conclusion that IEP adequately addressed student's interfering behaviors,

especially given fact that "the sufficiency of [the school district's] strategies for dealing with this

behavior is precisely the type of issue upon which the IDEA requires deference to the expertise

of the administrative officers"); *M.M. ex rel. A.M. v. N.Y.C. Dep't of Educ. Region 9 (Dist. 2)*,

583 F. Supp. 2d 498, 510 (S.D.N.Y. 2008) (no denial of FAPE and no violation of IDEA for

failing to conduct FBA where record indicated that student's interfering behaviors could be

addressed "with refocusing and redirection," and noting that SRO found FBA premature as

autistic student had not yet attended recommended placement); *Perricelli v. Carmel Cent. Sch.

Dist.*, No. 06-CV-2114, 2007 WL 465211, at *13 (S.D.N.Y. Feb. 9, 2007) (deferring to SRO's

determination that FBA was not required because student's teachers reported that student's

discipline problems were "workable" and not "too much to handle").

### D.      Compensatory Education

"Because compensatory education is a remedy for substantive FAPE claims, the absence of a substantive claim for a failure to provide a FAPE necessarily precludes the award of any compensatory services."  *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, No. 14-CV-3067, 2017 WL 3066888, at *9 (S.D.N.Y. July 18, 2017), *aff'd*, 927 F.3d 126 (2d Cir. 2019).  As I have found that the SRO correctly concluded that I.J.B. received a FAPE, this remedy is unavailable.

## IV.      <u>CONCLUSION</u>

Because the SRO appropriately found that the District offered I.J.B. a FAPE, Plaintiffs' motion for summary judgment is DENIED and Defendant's motion for summary judgment is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending motions, (ECF Nos. 18, 25), enter judgment for Defendant, and close the case.

**SO ORDERED.**

Dated: March 29, 2023
       White Plains, New York

_____
                    CATHY SEIBEL, U.S.D.J.